SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

5/17/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

IN THE MATTER OF THE SEARCH OF:

**FACEBOOK USER ID:**
**100001576738436**

Case No. _____3:19mj00032_____

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, David Wolf, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with the **FACEBOOK USER ID 100001576738436** ("TARGET ACCOUNT") account that is stored at premises owned, maintained, controlled, or operated by FACEBOOK, Inc. ("FACEBOOK"), a social network provider headquartered at 1601 Willow Road, Menlo Park, California 94025.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and § 2703(c)(1)(A) to require FACEBOOK to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since February of 2013.  I am currently assigned to the Richmond Division of the FBI, located in

Richmond, Virginia. My principal duties include the investigation of various criminal violations, to include national security violations of the United States.

3.      I am a federal law enforcement officer under applicable provisions of the United States Code under Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrants, and in executing court-ordered search warrants.

4.      The facts in this affidavit come from my personal knowledge and observations made during the course of this investigation, my training and experience, information obtained from other agents and witnesses, and upon my personal review of records, documents, and items lawfully obtained by third parties. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Through my training and experience, the Affiant has knowledge that domestic terrorists and persons affiliated with anarchist groups and/or conspirators will utilize cell phones, other electronic devices, electronic mail ("email"), and social media to conduct their illegal activity and maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting and execution of their political and social goals to include, but not limited to, espousing violence.

6.      I make this affidavit in support of an application by the United States of America for a warrant to search and seize evidence associated with TARGET ACCOUNT, as further described in Attachment A.

7.      Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 2101 (Riots) have been committed and

that the aforementioned FACEBOOK account will contain evidence thereof.  Furthermore, there

is probable cause to search the information described in Attachment A for evidence of these crimes

as further described in Attachment B.

## RELEVANT STATUTE

8.      *Riots*, Title 18, United States Code, Section 2101, provides that, "Whoever travels

in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including,

but not limited to, the mail, telegraph, radio, or television, with the intent to incite a riot; or to

organize, promote, encourage, participate in , or carry on a riot; or to commit any act of violence

in furtherance of a riot; or to aid and abet any person in inciting or participating in or carrying on

a riot or committing any act of violence in furtherance of a riot; and who either during the course

of any such travel or use or thereafter performs or attempts to perform any other overt act for any

purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph" shall be guilty of a

federal offense.

## JURISDICTION

9.      This Court has jurisdiction to issue the requested warrant because it is a "court of

competent jurisdiction" as defined by 18 U.S.C. § 2711, and 18 U.S.C. §§ 2703(a), (b)(1)(A), and

(c)(1)(A).  Specifically, the Court is a "district court of the United States…that has jurisdiction

over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND

10.     On August 12, 2017, a "Unite the Right" rally was held at Emancipation Park in Charlottesville, Virginia.  The purpose of the planned rally was to protest the removal of the Robert E. Lee and Thomas "Stonewall" Jackson statues in Charlottesville, Virginia.   Several groups espousing right-wing nationalist and/or white supremacist views attended the rally in support.

11.     In addition, several thousand counter-protestors attended the rally to oppose the rally and its supporters.  Throughout the day, several instances of violence occurred between protestors and counter-protestors.  At approximately noon, the rally was declared an unlawful assembly by the Charlottesville Police Department ("CPD"), and both protestors and counter-protestors dispersed to separate locations.

## PROBABLE CAUSE

12.     The FBI is conducting an investigation into possible violations of federal criminal law committed by NGUYEN. Specifically, a violation of Title 18, Section 2101.  The investigation was initiated following receipt of information that MYLES, WRIGHT, and NGUYEN, attended the August 12, 2017 "Unite the Right" Rally in Charlottesville, VA.  MYLES conducted two separate attacks upon protestors, with WRIGHT and NGUYEN providing protection for MYLES while the violent encounters occurred.

13.     The following series of screenshots related to these assaults are taken from a video uploaded to YouTube on October 16, 2017 entitled, "The Movie 2.0: Alt-Right vs Antifa in

Charlottesville - DeAndre Harris, Corey Long, Harold Crews".  As seen in the two screenshots below, MYLES takes hold of VICTIM 1's flagpole:





14.     In the next two screenshots, MYLES is seen kicking VICTIM 1.  NGUYEN is

wearing a black backpack with green trim:





15.     MYLES then throws VICTIM 1 to the ground after a second kick, this time to

VICTIM 1's knee, while WRIGHT closely is behind her, and seen in the far right of the frame.





16.    MYLES then lands several punches to the right temple of VICTIM 1:





17.     NGUYEN is seen below trying to keep an individual away who appears to be trying to assist VICTIM 1.



18.     The second confrontation that MYLES was engaged in is seen in the below screenshots with VICTIM #2, which were taken from a Youtube video uploaded on August 12, 2017, entitled, "Charlottesville Unite The Right Rally Charlottesville VA August 12 2017". MYLES is observed approaching a protestor (VICTIM 2) and engaging VICTIM 2 as he pushes

MYLES away.  Seen in MYLES hand is a blue spray canister,  which are seen in the following

screenshots:





19.    MYLES continues to follow VICTIM 2 as he is walking down E. Market Street, when she aims what appears to be a spray canister.  VICTIM 2 is pushed into MYLES by another unidentified individual wearing all black clothing:





20.     MYLES is then seen taking the spray canister and lifting it in front of VICTIM 2's face, while NGUYEN is seen following MYLES close behind:





21.    VICTIM 2 tries to get away from MYLES and pushes her away, to which MYLES throws the blue canister at VICTIM 2:







22.   MYLES then chases VICTIM 2 and tries to stomp his knee:



23.    WRIGHT and NGUYEN are seen trailing MYLES to protect her, and WRIGHT is seen using the wooden board (with a metal door handle attached) to keep others away:



24.    The FBI conducted a review of Facebook search warrant returns on WRIGHT and discovered that NGUYEN was utilizing TARGET ACCOUNT.   Below are screenshots of TARGET ACCOUNT in approximately November 2017 when NGUYEN utilized vanity name "Dan Nestor".



25.    Note the same black backpack strap with green trim on the below photo:



26.    As of approximately April of 2019 NGUYEN was utilizing vanity name "Ren Noir" and conversing with WRIGHT:





27.    On April 17, 2017 the following exchange took place on Facebook:

a.  **DAVID WESTERGAARD**:

-Nah I get you.

-I'm always thinking of what happens when we have to punch out in a hurry

and how best to get out and blend in.

-Maybe we need to like establish levels of battle gear for us lol

b.  **MYLES**: (unintelligible symbol)

c.  **WRIGHT**: Danny is the undisputed world champ of post-action clothes

changing hahaha

d.   **NGUYEN**: me too thanks

e.   **WRIGHT**: But as far as the battle rattle goes, we should definitely figure a
level system

f.   **NGUYEN**: I say, we should study up some military tactics

28.   A search conducted through law enforcement records revealed that WRIGHT, known to utilize phone number **703-220-5862,** had telephonic contact at approximately 1:39 p.m. and again at 2:08 p.m. Eastern Standard Time with phone number **(301) 250-0340,** known to be utilized by NGUYEN,  on August 12, 2017. There was a subsequent telephonic contact between these two phone numbers again on August 25, 2017.

## BACKGROUND CONCERNING FACEBOOK

29.   FACEBOOK owns and operates a free-access social networking website of the same name that may be accessed at http://www.FACEBOOK.com.  FACEBOOK allows its users to establish accounts with FACEBOOK, and users can then use their accounts to share written news, photographs, videos, and other information with other FACEBOOK users, and sometimes with the general public.

30.   FACEBOOK asks users to provide basic contact and personal identifying information to FACEBOOK, either during the registration  process  or  thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, FACEBOOK passwords, FACEBOOK security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. FACEBOOK also assigns a user identification number to each account.

31.     FACEBOOK users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. FACEBOOK assigns a group identification number to each group. A FACEBOOK user can also connect directly with individual FACEBOOK users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of FACEBOOK and can exchange communications or view information about each other. Each FACEBOOK user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32.     FACEBOOK users can select different levels of privacy for the communications and information associated with their FACEBOOK accounts. By adjusting these privacy settings, a FACEBOOK user can make information available only to himself or herself, to particular FACEBOOK users, or to anyone with access to the Internet, including people who are not FACEBOOK users. A FACEBOOK user can also create "lists" of FACEBOOK friends to facilitate the application of these privacy settings. FACEBOOK accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from FACEBOOK.

33.     FACEBOOK users can create profiles that include photographs, lists of personal interests, and other information. FACEBOOK users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. FACEBOOK users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, FACEBOOK users can "check in" to particular locations or

add their geographic locations to their FACEBOOK posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34.    FACEBOOK allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other FACEBOOK users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a l ink to see the photo or video. For FACEBOOK's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

35.    FACEBOOK users can exchange private messages on FACEBOOK with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on FACEBOOK, which also stores copies of messages sent by the recipient, as well as other information. FACEBOOK users can also post comments on the FACEBOOK profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, FACEBOOK has a Chat feature that allows users to send and receive instant messages through FACEBOOK.  These chat communications are stored in the chat history for the account. FACEBOOK also has a Video Calling feature, and although FACEBOOK does not record the calls themselves, it does keep records of the date of each call.

36. If a FACEBOOK user does not want to interact with another user on FACEBOOK, the first user can "block" the second user from seeing his or her account.

37. FACEBOOK has a "like" feature that allows users to give positive feedback or connect to particular pages. FACEBOOK users can "like" FACEBOOK posts or updates, as well as webpages or content on third-party *(i.e.,* non-FACEBOOK) websites. FACEBOOK users can also become "fans" of particular FACEBOOK pages.

38. FACEBOOK has a search function that enables its users to search FACEBOOK for keywords, usernames, or pages, among other things.

39. Each FACEBOOK account has an activity log, which is a list of the user's posts and other FACEBOOK activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a FACEBOOK page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's FACEBOOK page.

40. FACEBOOK Notes is a blogging feature available to FACEBOOK users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41. The FACEBOOK Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. FACEBOOK users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42.     FACEBOOK also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, FACEBOOK also provides its users with access to thousands of other applications ("apps") on the FACEBOOK platform. When a FACEBOOK user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44.     Some FACEBOOK pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. FACEBOOK can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. FACEBOOK uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

45.     FACEBOOK uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' FACEBOOK user identification numbers; groups and networks of which the user is a member, including the groups' FACEBOOK group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of FACEBOOK applications.

46.     FACEBOOK also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP

address on FACEBOOK, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a FACEBOOK profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47.     Social networking providers like FACEBOOK typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, FACEBOOK users may communicate directly with FACEBOOK about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like FACEBOOK typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48.     As explained herein, information stored in connection with a FACEBOOK account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a FACEBOOK user's "Neoprint," IP log, stored electronic communications, and other data retained by FACEBOOK, can indicate who has used or controlled the FACEBOOK account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated

with the foregoing, such as date and time) may be evidence of who used or controlled the FACEBOOK account at a relevant time. Further, FACEBOOK account activity can show how and when the account was accessed or used. For example, as described herein, FACEBOOK logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of FACEBOOK access, use, and events relating to the crime under investigation.

49. Additionally, FACEBOOK builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and FACEBOOK "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the FACEBOOK account owner.

50. Last, FACEBOOK account activity may provide relevant insight into the FACEBOOK account owner's state of mind as it relates to the offense under investigation. For example, information on the FACEBOOK account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51. Therefore, the computers of FACEBOOK are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of FACEBOOK, such as account access information, transaction information, and other account information.

## CONCLUSION

52.     Based on the foregoing, I respectfully request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

53.     I further request that the Court direct FACEBOOK to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on FACEBOOK, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

54.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/David Wolf*
David Wolf, Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn and attested to by telephone on this __17th__ day of May 2019.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE



## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with **FACEBOOK USER ID 100001576738436** that is stored at premises owned, maintained, controlled, or operated by FACEBOOK, INC. ("Provider"), headquartered at 1601 WILLOW ROAD, MENLO PARK, CALIFORNIA 94025.



SEALED

# ATTACHMENT B

## Particular Things to be Seized

I.     **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of FACEBOOK ("Provider"), including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) from the time period of **January 1, 2017 to November 1, 2017**, the Provider is required to disclose to the government the following information pertaining to each USER ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other FACEBOOK activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' FACEBOOK user identification numbers; groups and networks of which the user is a member, including the groups' FACEBOOK group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of FACEBOOK applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all FACEBOOK posts and all non-FACEBOOK webpages and content that the user has "liked";

(j)     All information about the FACEBOOK pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of FACEBOOK searches performed by the account;

(m)     All information about the user's access and use of FACEBOOK Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual FACEBOOK posts and activities, and all records showing which FACEBOOK users have been blocked by the account;

(q)     All records pertaining to communications between FACEBOOK and any person regarding the user or the user's FACEBOOK account, including contacts with support services and records of actions taken.

FACEBOOK is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 USC § 2101 involving DANIEL NGUYEN and/or FACEBOOK USER ID 100001576738436, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  Records relating to the content of all outbound and inbound communications for this account;

(b)  Evidence indicating how and when the FACEBOOK account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the FACEBOOK account owner;

(c)  Evidence indicating the FACEBOOK account owner's state of mind as it relates to the crime under investigation;

(d)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).